Robert KERMAN, Plaintiff–Appellant,

v.

The CITY OF NEW YORK, Daniel Di-Lucia, William Crossan, John Hume, Thomas Loomis, Steve Kaminski, Mark DeMarco, Andrew Oberfeldt, James Moran, Edward Joergens, "John Doe", "Richard Roe", "Jane Doe", (the last three names being fictitious, said individuals being employ-ees of the City of New York who participated in taking plaintiff, Robert Kerman, into custody or in dispatching police officers to Robert Kerman's home or operating the City's Emergency Medical Service 911 system as set forth in the complaint), Defendants–Appellees.

Docket No. 00–9130.

United States Court of Appeals, Second Circuit.

Argued March 22, 2001.

Decided July 26, 2001.

Gregory Abbey, New York, NY, for Plaintiff–Appellant.

Linda H. Young, New York, NY (Assistant Corporation Counsel for the City of New York, Michael Hess, Corporation Counsel, of counsel), for Defendants–Appellees.

Before: FEINBERG, NEWMAN and PARKER, Circuit Judges.

FEINBERG, Circuit Judge:

Plaintiff Robert Kerman appeals from a judgment in the United States District Court for the Southern District of New York (Robert J. Patterson, J.) dismissing his complaint against nine defendant police officers and the City of New York. Plaintiff also appeals from an earlier order in the Southern District (Lawrence M. McKenna, J.) granting partial summary judgment for defendants. Kerman's complaint, brought under 42 U.S.C. § 1983, alleged that defendant police officers violated his rights under the First and Fourth Amendments to the United States Constitution when they forcibly entered his apartment without a warrant, restrained him and sent him to a hospital against his will. Plaintiff also brought state law claims for battery, false imprisonment and intentional infliction of emotional distress. We affirm in part and reverse in part, as more fully set forth below, and remand for further proceedings not inconsistent with this opinion.

## I. Background

### A. Kerman's encounter with the police

Early on the morning of October 20, 1995, Kerman called his girlfriend, Phyllis Landau, and informed her that he was drunk and intended to buy a gun and kill himself or his psychiatrist. Kerman was then 47 years old. He had made similar threats in the past, which had not been consummated. On this occasion, however, Landau was particularly concerned because she knew that Kerman had recently entered an experimental study conducted by the New York State Psychiatric Institute at Columbia Presbyterian Hospital and had stopped taking his antidepressant medication as a condition of the study. Kerman suffers from a combination of depression and borderline personality disorder.

Six hours later, Landau called Dr Kevin Malone, the psychiatrist in charge of the study, to seek advice. Upon the doctor's recommendation, Landau then called 911. She gave Kerman's address and telephone number to the 911 operator and stated that a mentally ill man at this location was off his medication and acting crazy and possibly had a gun. She did not give her name and identified Kerman only as "a man". In addition, Landau never mentioned her relationship to Kerman. Based on this information, police officers and an ambulance were dispatched to Kerman's apartment and arrived around noon.

From the record before us, the pertinent facts of the encounter with police viewed in the light most favorable to Kerman, as we must on an appeal from a grant of summary judgement, are as follows.[1] When the officers arrived, they rang the doorbell, pounded on the door and announced their presence for several minutes. During this period, Kerman was in the shower. When he finally heard the doorbell, Kerman came to the door dressed only in a towel and, not knowing who was creating

---

1. As will be seen below, some of the crucial facts are in dispute.

the stir, opened the door a crack. According to Kerman, the officers slammed the partially open door into his forehead, sending his eyeglasses flying and knocking him to the floor. The officers then rushed in, jumped on Kerman's back, grabbed and pulled his arms behind him and handcuffed him. Also, one of them allegedly held a gun to his head and said, "Listen you fucking nut-job, just hold still or I'll blow your brains out." Kerman initially resisted, thinking he was about to be killed by unknown assailants, but then, still lying face down, he realized that his attackers were police officers. At that point, he stopped struggling.

The officers then dragged Kerman on his stomach up a short flight of stairs, pulled him up and pushed him against a wall. As a result of the scuffle, Kerman stood naked. Officer Crossan, the sergeant[2] in charge of the other officers and present throughout the encounter, was holding the door to Kerman's apartment open and people had gathered to see what was happening. When Kerman asked Crossan to shut the door Crossan replied, "You shut your fucking mouth, I'll shut the door when I want to."

Kerman was kept handcuffed and naked for an hour while the police searched his apartment. He acknowledges that during the search, he made hostile remarks to the police, noting among other things that "it must be a slow day at Dunkin Donuts" and that the officers gave "Mark Fuhrman a good name." At one point, in response to his complaints that the handcuffs were painfully tight, one of the officers yanked on them, making them tighter. In another interaction, Sergeant Crossan demanded to know where the gun was hidden and grabbed Kerman by the face and pulled

upward. The officers would not let Kerman put on clothing. No gun was ever found.

During the search, Landau called the apartment. She identified herself as the person who had called 911 at the suggestion of Dr. Malone, and she gave the police her name. The police would not let her speak to Kerman, made no attempt to verify the urgency of the original call and hung up on her. When the paramedics arrived with the ambulance, they telephoned Dr. Malone. Kerman spoke briefly with Malone and asked the doctor to "get these goons out of here." When Crossan heard this he grabbed the phone and hung up. No one asked the doctor about Kerman's mental health. Before transporting him to the hospital, the officers insisted that Kerman be placed in a restraint bag. Kerman alleges that this was retaliation for his threats to sue police for their conduct. He claims that Crossan stated, "I'm going to teach you a lesson ... I'll give you something to sue for."

Kerman volunteered to walk to the ambulance waiting outside his apartment building. Crossan denied the request and ordered Kerman to be kept in the restraint bag and wheeled to the ambulance on a stretcher. When the police placed Kerman on the stretcher, they laid him down on his back with his hands cuffed behind and under him. Kerman weighed about 270 pounds, and this position was very painful for him. While on the stretcher, Kerman asked a paramedic to cover his face with a towel so that his neighbors might not identify him. When Crossan saw the towel covering Kerman's face, he removed it stating, "You're not getting that." Finally, Kerman asked to be taken to Columbia

---

**2.** Crossan was later promoted and during the trial in the district court he held the rank of lieutenant.

Presbyterian Hospital where Dr. Malone could oversee his care. Instead, Crossan insisted that Kerman be taken to Bellevue. Kerman was kept handcuffed and on his back in the restraint bag on his way to the hospital. After admission to Bellevue he was held overnight for observation and released the following day.

## B. Proceedings in the district court

In October 1996, Kerman brought the instant suit in the district court. In July 1999, Judge McKenna in a written opinion granted summary judgment for all nine defendant police officers on all but two of Kerman's claims. With regard to the claims on which he granted summary judgment, Judge McKenna found that the officers' actions were reasonable or that they were entitled to qualified immunity. He denied the officers' summary judgment motion as to that portion of Kerman's excessive force claim under § 1983 and state law battery claim based on the officers' actions after they handcuffed Kerman.

In August 2000, a jury trial on these two remaining claims began before Judge Patterson. At the close of evidence, the court submitted a verdict form to the jury. The jury found Crossan liable on Kerman's § 1983 excessive force claim, awarded Kerman $75,000 on that claim and indicated on the verdict form that punitive damages were warranted. The jury found Crossan not liable on the battery claim and found the other eight officers not liable on both the battery and excessive force claims. Testimony on the punitive damages issue was set to begin the following morning.

The next day, Judge Patterson determined that the jury's responses to the verdict form's questions regarding Crossan were inconsistent. The judge asked the jury to resolve the inconsistency in Crossan's verdict and accepted a partial verdict for the other eight officers on both the excessive force and battery claims. Later, Judge Patterson accepted a verdict of not liable for Crossan on the battery claim. Despite continued deliberations, the jury could not reach a second unanimous verdict with respect to Crossan on the excessive force claim. In response to Crossan's renewed Rule 50 motion for judgment as a matter of law, the district court held in a bench ruling that Crossan was not liable due to qualified immunity. The court then entered judgment for all nine defendants on all claims. This appeal followed.

## II. Discussion

On appeal, Kerman argues principally that defendant police officers violated his rights under the Fourth Amendment by forcibly entering his apartment without a warrant and by handcuffing, detaining and hospitalizing him without probable cause. In addition, he contends that the district court committed numerous errors of federal and state law compelling reversal. We consider these arguments in turn.

## A. Warrantless entry

Kerman contends that Judge McKenna erred in concluding, on a motion for summary judgment, that defendant police officers entered his apartment legally. On this issue, Judge McKenna held that "the 911 call alone" was a sufficient basis to support defendants' reasonable belief that exigent circumstances justified the forced entry or, alternatively, that the officers' exercise of discretion was protected by qualified immunity. We review the district court's decision to grant summary judgment de novo. *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir.1999). "To prevail on a motion for summary judgment, the moving party must show that there are no genuine issues of material fact and that

the moving party is entitled to that judgement as a matter of law." *Id.* As noted above, in reviewing the district court, we must view the facts in the light most favorable to the non-moving party.[3]

### 1. Exigent Circumstances

■ Warrantless searches are presumptively unreasonable, *Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). However, "police officers may enter a dwelling without a warrant to render ... assistance to a person whom they reasonably believe to be in distress." *Tierney v. Davidson,* 133 F.3d 189, 196 (2d Cir.1998) (internal quotation marks and citations omitted). For Fourth Amendment purposes, the reasonableness of an officer's belief must be assessed in light of the particular circumstances confronting the officer at the time. *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). We first address the question of whether, in light of this test, Kerman has alleged a constitutional violation at all. See *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991) ("We think the Court of Appeals should not have assumed, without deciding, this preliminary [constitutional] issue in this case...."). See also *Monday v. Oullette,* 118 F.3d 1099, 1102 (6th Cir.1997) ("When determining whether qualified immunity protects an official, we must first determine whether the plaintiff has presented facts which, if proven, demonstrate that the defendant violated a constitutional right."). "Deciding the constitutional question before addressing the qualified immunity question also promotes

clarity in the legal standards for official conduct." *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999).

■ The pertinent facts on this issue are not materially contested. Defendants do not dispute that the anonymous 911 call was the sole basis for their conclusion that exigent circumstances justified a forced entry into Kerman's apartment. The officers acknowledge that before the entry they did not conduct any investigation to confirm the call. Moreover, before entering the apartment, the police did not know who the caller was or what her relationship was to Kerman. Kerman argues that the anonymous 911 call here "had zero indicia of reliability" and that it therefore could not, by itself, justify the warrantless entry.

Kerman's argument finds support in a recent Supreme Court decision. In *Florida v. J.L.,* 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), an anonymous 911 call reported that a young man wearing a plaid shirt and standing at a bus stop was carrying a gun. The Court considered whether such a call, together with police observation of a similarly dressed suspect, could justify a "stop and frisk" of the individual; i.e., a *"Terry* stop".[4] In *J.L.,* the Court observed that anonymous informants present obvious problems: their reputation for veracity cannot be assessed, and they cannot be held responsible if their "allegations turn out to be fabricated." 120 S.Ct. at 1378. As a result, the Court held that "an anonymous tip lacking indicia of reliability

---

**3.** On appeal, defendants claim that in reviewing Judge McKenna's grant of summary judgment, we must consider only the record made for the summary judgment motion, and that we cannot consider any of the evidence at the subsequent trial before Judge Patterson. We do not find persuasive the argument that we cannot consider the entire record before us when we review de novo the district court's rulings.

**4.** The reference, of course, is to *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

... does not justify a stop and frisk whenever and however it alleges the illegal possession of a firearm." *Id.* at 1380.

*J.L.* differs in certain respects from the present case. There, the anonymous tip served to justify only a reasonable suspicion of criminal activity and the resulting *Terry* stop. No concern for exigent circumstances was present. In addition, the anonymous call in *J.L.* identified the defendant only by the color of his shirt, while Landau's call gave specific information about Kerman's behavior and the interruption of his medication. Nonetheless, we believe that the Court's reasoning in *J.L.* controls the issue here: whether an uncorroborated and anonymous 911 call is sufficient to establish probable cause for a warrantless entry into a dwelling. Probable cause for a forced entry in response to exigent circumstances requires finding a probability that a person is in "danger." *Tierney,* 133 F.3d at 196–97. By comparison, "the level of suspicion required for a *Terry* stop is obviously less demanding than for probable cause," *Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) (internal quotation marks and citations omitted), in part because a *Terry* stop is clearly a less intrusive violation of privacy than a forced entry into an apartment. See *Ayeni v. Mottola,* 35 F.3d 680, 685 (2d Cir.1994), abrogated on other grounds by *Wilson v. Layne,* 526 U.S. 603, 119 S.Ct. 1692 ("The home has properly been regarded as among the most highly protected zones of privacy...."), abrogated on other grounds by *Wilson v. Layne,* 526 U.S. 603, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999).

The anonymous call in the instant case may have presented a clearer and more imminent threat of harm than the call considered by the Court in *J.L.* However, the privacy interest at issue here is much greater than in *J.L.* Defendants here relied on the anonymous 911 call to justify an invasion of "the sanctity of [a] private dwelling[ ] ... ordinarily afforded the most stringent Fourth Amendment protection." *Ayeni,* 35 F.3d at 685 (internal quotation marks and citations omitted). Moreover, in contrast to *J.L.,* defendants had no corroborating evidence of the alleged danger to establish reliability. See also *Oliveira v. Mayer,* 23 F.3d 642, 647 (2d Cir.1994) (in order to establish probable cause, individual tip must be "sufficiently reliable and corroborated."). Based on the absence of evidence in the record to corroborate the 911 call and the protections afforded to private dwellings under the Fourth Amendment, we find that the officers' warrantless entry into Kerman's apartment violated the Fourth Amendment.

### 2. Qualified Immunity

■ Because Kerman has alleged a constitutional violation under current law, we next turn to Judge McKenna's alternative basis for summary judgment: the officers' defense of qualified immunity. Qualified immunity will attach to an officer's decision to enter a dwelling in response to perceived exigent circumstances so long as the "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The objective element of this test requires the court to look beyond the generalized constitutional protection, such as the right to be free of unreasonable searches and seizures, and to determine whether the law is clearly established in a more particularized sense. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1986). "The contours of the right must be sufficiently clear that a reasonable official would understand

that what he is doing violates that right." *Id.*

■ Although we have just determined above that under present law the officers could not make a warrantless entry into Kerman's apartment on the basis of the anonymous 911 call alone, the question remains whether this was clearly established in October 1995, when the entry occurred. At that time, the Supreme Court itself had not yet specifically so held. On the other hand, *J.L.* did not purport to establish a "new" rule of constitutional law. Instead, the Court explained its holding as a logical extension of *Alabama v. White*, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). *J.L.*, 120 S.Ct. at 1379 (Court stated that it had classified *White* as a "close call" and that "the tip in the instant case lacked the moderate indicia of reliability present in *White.*"). However, *White* involved an investigatory stop of a vehicle, not the warrantless entry into an apartment. It is true that even before *White* was decided, the Court had already cast doubt on the reliability and constitutional sufficiency of anonymous tips. See e.g. *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). But always under facts distinguishable from those of the present case; in *Illinois v. Gates*, the Court relied on "independent investigation," 462 U.S. at 237–38, 103 S.Ct. 2317, as well as on the anonymous tip and in *Adams v. Williams* the crucial question concerned the legality of a *Terry* stop.

■ Notwithstanding these earlier indications of the law's likely evolution, we cannot say that for qualified immunity purposes the current law governing the war-

rantless entry in this case was clearly established by October 1995. A reasonable police officer cannot be expected to anticipate developments in the law. The Court's qualified immunity jurisprudence denies immunity only where it is "sufficiently clear that a reasonable official would understand that what he is doing violates [the law]. . . ." *Anderson v. Creighton*, 483 U.S. at 640, 107 S.Ct. 3034. We find that at the time of the officers' conduct in this case no clearly established law prohibited a warrantless entry into an apartment on the ground of exigent circumstances based solely on an anonymous 911 call. Therefore, we affirm the district court's grant of summary judgment to all nine defendant police officers with regard to defendants' entry into Kerman's apartment.

**B. Initial Seizure**

We next turn to Kerman's claim that the district court erred when it granted summary judgment for the police officers on their decisions to handcuff and detain Kerman during the search of his apartment.

■ Police decisions to seize a person are evaluated under the Fourth Amendment's reasonableness standard. *Glass v. Mayas*, 984 F.2d 55, 58 (2d Cir.1993). An officer's decision to handcuff and detain a person will not violate the Constitution so long as the officer had probable cause to believe that the person presented a risk of harm to himself or others. *Monday v. Oullette*, 118 F.3d at 1102. Once again, even if we find that the officers violated the Constitution they may still be entitled to qualified immunity.

■ We first consider Kerman's claim that his initial seizure and detention after the forced entry were unreasonable.[5] As

---

5. Kerman's Fourth Amendment seizure claim encompasses both his initial handcuffing and

detention in his apartment as well as his eventual hospitalization at Bellevue for over-

noted above, after entry, the officers immediately subdued and handcuffed Kerman and detained him for the duration of the search of the apartment. Kerman argues that it was unnecessary to handcuff him at all and that, in any event, once he realized what was happening, he calmed down and should have been uncuffed.

We have just held, in Part II.A above, that under current law, police officers may not rely on an anonymous and uncorroborated 911 call to justify a warrantless entry into a private dwelling. We reasoned that such a call, by itself, could not provide the foundation for a reasonable belief that exigent circumstances existed. This reasoning is equally applicable on the issue of Kerman's initial seizure. On Kerman's version of the facts, the police had no information beyond the 911 call upon which to establish a reasonable belief that he presented a threat of physical harm to himself or others. Because the police cannot now rely on the 911 call, Kerman has alleged a constitutional violation with respect to his initial handcuffing and detention.

█ Nevertheless, we have also just held in Part II.A that the officers' reliance on the 911 call and their decision to enter Kerman's apartment were not objectively unreasonable under clearly established law as it stood in October 1995. A fortiori, once inside the apartment reasonable police officers could at the very least disagree over whether, in light of the mention of a gun in the 911 call, they could protect themselves in what could have been a dangerous situation. This includes handcuffing and immobilizing Kerman until they

had secured his apartment and conducted a thorough search for the firearm. Therefore, with respect to the handcuffing and detention, we again affirm the district court's grant of summary judgment to all nine defendants on the basis of qualified immunity.

## C. Excessive force

Kerman also argues that the police used excessive force throughout the encounter in his apartment. In particular, Kerman objects to the manner in which the police executed the warrantless, forced entry and his initial seizure, the tightness of his handcuffs, the alleged battery by officer Crossan and Kerman's confinement in a restraint bag in an uncomfortable position. As already noted, Judge McKenna granted summary judgment to all defendants with respect to the forced entry and initial seizure claims but denied summary judgment on Kerman's excessive force claim under § 1983 based on the officers' actions after they had handcuffed Kerman. Later, there was a trial before Judge Patterson on this claim, at which the jury held, in a partial verdict accepted by Judge Patterson, in favor of all the officers except Crossan. Thereafter, Judge Patterson held as a matter of law that officer Crossan was entitled to qualified immunity on the remaining excessive force claim. We review both Judge McKenna's grant of summary judgment and Judge Patterson's judgment as a matter of law de novo. *Thomas v. Roach*, 165 F.3d at 142.[6]

█ "[A]ll claims that law enforcement officers have used excessive force— deadly or not—in the course of an arrest,

night observation. We address the substance of Kerman's seizure claim as it relates to the hospitalization in Part II.D infra.

6. On appeal, Kerman has not challenged the sufficiency of the evidence for the partial ver-

dict accepted by Judge Patterson. Instead, as discussed in note 8 infra, Kerman does argue that Judge Patterson erred by accepting a partial verdict at all.

investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard...." *Graham v. Connor,* 490 U.S. at 395, 109 S.Ct. 1865 (emphasis in original). A determination of reasonableness under the Fourth Amendment "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396, 109 S.Ct. 1865 (internal quotation marks and citations omitted). Evaluation of a particular use of force "must be ... from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.,* citing *Terry v. Ohio,* 392 U.S. at 20–22, 88 S.Ct. 1868. Again, even if defendants' actions were unreasonable under current law, "[q]ualified immunity ... protects officers from the sometimes 'hazy border between excessive and acceptable force.'" *Saucier v. Katz,* 531 U.S. 991, 121 S.Ct. 2151, 2158, 150 L.Ed.2d 272 (2001). "If the officer's mistake as to what the law requires is reasonable ... the officer is entitled to the immunity defense." *Id.*

### 1. Judge McKenna's Summary Judgment Decision

█ We turn first to Judge McKenna's grant of partial summary judgment to all defendants regarding the manner of the forced entry and initial seizure. Once again, our holding in part II.A above controls the analysis. We held there that although the law now clearly prevents the police from relying on the anonymous phone call from Landau, the law in October 1995 was not sufficiently clear on that issue to deny qualified immunity to a police officer who relied on such a tip. Under the law as it then was, the defendants were entitled to qualified immunity for their decisions to rely on the description in Landau's call and to execute the forced

entry in a manner reasonably consonant with the threat alleged. A forced entry into the apartment of an emotionally disturbed man possibly wielding a firearm cannot be dealt with by half measures. Based on the information in the call, the police did not act unreasonably in choosing to enter and immobilize Kerman as quickly and safely as possible. While it is true that the language attributed to officer Crossan immediately after entry was provocative, we do not find his language, standing alone, sufficient to upset Judge McKenna's grant of partial summary judgment on Kerman's claim that the police used excessive force in entering his apartment and immobilizing him.

### 2. Judge Patterson's Grant of Crossan's Rule 50 Motion

█ We next address Judge Patterson's ruling, in response to Crossan's motion under Fed.R.Civ.P. 50, that Crossan was entitled to judgment as a matter of law on the portion of the excessive force claim that went to trial. The district court ruled that Crossan was ·entitled to qualified immunity because, from the perspective of a reasonable officer, "the facts ... [in] evidence do not constitute ... excessive force."

We disagree. As Judge McKenna originally found and we now reaffirm, the contrasting accounts of *both* Kerman's and Crossan's conduct following the initial seizure and handcuffing present factual issues as to the degree of force actually employed and its reasonableness. If the jury were to credit Kerman's version of the facts and believe his allegations of handcuff tightening, infliction of pain, verbal abuse, humiliation and unnecessary confinement to a restraint bag in a painful position, our prior cases indicate that the use of force under Crossan's supervision might well be objectively unreasonable and

therefore excessive. See *Breen v. Garrison*, 169 F.3d 152, 153 (2d Cir.1999) (per curiam); *Calamia v. City of N.Y.*, 879 F.2d 1025, 1035 (2d Cir.1989); *Robison v. Via*, 821 F.2d 913, 923–24 (2d Cir.1987). However, the parties' versions of the facts differ markedly and "[s]ummary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness." *Thomas v. Roach*, 165 F.3d at 143. Therefore, we remand to the district court the issues of whether Crossan employed excessive force following the initial seizure and handcuffing of Kerman and whether qualified immunity attaches.

### D. Hospitalization at Bellevue

 We next turn to the constitutionality of the officers' decision to hospitalize Kerman.[7] As we pointed out in note 4 supra, Kerman's Fourth Amendment seizure claim encompasses both his initial handcuffing and detention as well as his hospitalization. As with Kerman's other Fourth Amendment claims, Judge McKenna granted summary judgment for all the officers with respect to their decision to transport Kerman to Bellevue. In his written opinion, Judge McKenna reasoned that, under the circumstances, reasonable officers could at least disagree as to whether Kerman presented a threat of harm to himself or others. We review this conclusion de novo.

Unlike the initial seizure issue we considered above in Part II.B, all the parties agree that the police did not have to rely exclusively on the 911 call in making the decision to transport Kerman to Bellevue. In addition to the 911 call, the officers spent more than an hour searching the apartment, during which they had ample opportunity to observe Kerman's behavior and his living conditions. With this in mind, we must analyze the police decision to hospitalize Kerman under the Fourth Amendment's reasonableness standard.[8] As with the other claims, a finding that the officers violated the Constitution does not necessarily prevent the application of qualified immunity.

Our analysis begins with a review of the investigatory steps taken by the police once they entered the apartment and subdued Kerman. We find it significant that the police failed to corroborate the gravamen of Landau's 911 call; the officers never found a gun. Also, in contrast to the description given by Landau, Kerman claims that he acted in a calm, if irritated, manner once he realized what was going

---

**7.** Kerman brings two distinct claims based on the officers' decision to commit him to Bellevue. The first, an unreasonable seizure claim brought under the Fourth Amendment, is considered in this section. The second, a First Amendment claim for retaliation, is discussed in Part II.E infra.

**8.** Defendants argue that their decision to hospitalize Kerman is privileged under N.Y. Mental Hygiene Law § 9.41 which states in pertinent part:

> Any peace officer, when acting pursuant to his or her special duties, ... may take into custody any person who appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others. Such

officer may direct the removal of such person or remove him or her to any hospital specified in subdivision (a) of section 9.39 or any comprehensive psychiatric emergency program specified in subdivision (a) of section 9.40, or, pending his or her examination or admission to any such hospital or program, temporarily detain any such person in another safe and comfortable place ...

We interpret this provision consistently with the requirements of the Fourth Amendment and therefore assume that the same objective reasonableness standard is applied to police discretion under this section. Therefore, our constitutional analysis controls this state law issue as well.

on. Furthermore, the officers deliberately ignored two opportunities to confirm the seriousness of Kerman's condition. The police gave short shrift to Landau when she called the apartment, and hung up on Dr. Malone without making any effort to ascertain whether Kerman presented a threat to himself or others. We recognize that police officers are often forced to make spot judgments about a person's mental health and should be entitled to reasonable leeway in those situations. However, here the officers had the opportunity to consult a medical professional familiar with the patient's condition. We cannot see the reasonableness of hanging up on a doctor in such a situation.

Notwithstanding their decision to hang up on Dr. Malone, the police may have been entitled to hospitalize Kerman if his conduct or the condition of his apartment demonstrated a dangerous mental state. The police claim that Kerman was ranting, screaming and acting unstable. In addition, the police portray Kerman's apartment as an Augean stable. Kerman disputes these claims, contending that he was calm during most of his encounter with the police and that his apartment was, at worst, untidy. At this stage we must credit Kerman's version of the facts. In that light, a fact-finder could well find that the police acted outside the bounds of both the Fourth Amendment and the qualified immunity standards of objective reasonableness in placing Kerman in restraints for his eventual transport to Bellevue. According to Kerman, the police not only failed to reasonably investigate his mental state, they also grossly misjudged the situation as it unfolded before them.

Kerman's allegations are serious and given his account Judge McKenna's summary judgment for Officer Crossan on qualified immunity grounds was not appropriate. See *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir.1999). ("An officer contemplating an arrest is not free to disregard plainly exculpatory evidence....") However, defendants tell a different story, and given the disputed accounts, a jury should decide what transpired between the officers and Kerman. Once the outstanding factual questions are answered, there will remain for decision in the district court the issues of whether officer Crossan violated the Fourth Amendment and, if so, whether he is nevertheless entitled to qualified immunity. There is no material dispute before us as to whether officer Crossan was in command during the entire encounter. In addition, it is clear from the record that Crossan alone decided that Kerman should go to the hospital. On these facts, we conclude that Crossan was solely responsible for Kerman's hospitalization. Therefore, we reverse the district court's grant of summary judgment on this issue for defendant Crossan and remand for further proceedings. We affirm Judge McKenna's grant of summary judgement with respect to the other eight defendants.

### E. Retaliation for protected speech

Kerman claims that the police violated his First Amendment rights by taking him to Bellevue Hospital in retaliation for his derogatory remarks to the police and his threats to sue them. Judge McKenna granted summary judgment to all defendants on this issue, finding that the officers had probable cause to remove Kerman to the hospital or, in the alternative, that the officers' decision was objectively reasonable and entitled to qualified immunity. We now turn to Kerman's arguments regarding his First Amendment claim and review de novo Judge McKenna's grant of summary judgment.

 Before plaintiff can survive summary judgment on his First Amendment retaliation claim, he must show that (i) he

has an interest protected by the First Amendment, (ii) the defendants' actions were motivated by or substantially caused by the plaintiff's exercise of that right and (iii) the defendants' actions chilled the exercise of those rights. *Connell v. Signoracci*, 153 F.3d 74, 79 (2d Cir.1998) (citations omitted).

■■■ Kerman's right to criticize the police without reprisal clearly satisfies the first prong of this test. "[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *City of Houston v. Hill*, 482 U.S. 451, 461, 107 S.Ct. 2502, 96 L.Ed.2d 398. Speech directed at police officers will be protected unless it is "likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance or unrest." *Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 415 (2d Cir.1999) (internal quotation marks and citations omitted). Also, the third prong of the *Signoracci* test is clearly met: an involuntary overnight trip to Bellevue has an obvious chilling effect.

■■■ However, the subjective motivation analysis under the second prong of the test is a closer question since it turns on Kerman's allegations regarding Crossan's state of mind. In the context of First Amendment retaliation, "bare allegations of malice cannot overcome the qualified immunity defense." *Crawford El v. Britton*, 523 U.S. 574, 588, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998) (internal quotation marks and citations omitted). Here, however, Kerman does not rely on claims of generalized malice but points to direct evidence of Crossan's actual mental state; i.e., Crossan's comment that he would teach Kerman a lesson and give him something to sue for. Resolving all factual disputes in Kerman's favor, as we must when reviewing a grant of summary judgment, we find that Kerman has adequately alleged a retaliatory motive.

We therefore find that, on Kerman's version of the facts, he has established a claim for retaliation. However, as in Part II.D above, there is no material dispute that officer Crossan alone made the decision to hospitalize Kerman. Therefore, we reverse Judge McKenna's grant of summary judgment on this issue with respect to officer Crossan and remand for further proceedings. We affirm Judge McKenna's grant of summary judgment for the other eight defendants.

**F. Jury verdict inconsistency**

Kerman next argues that Judge Patterson erred when he asked the jury to reconsider their $75,000 verdict against officer Crossan. Kerman asks us to reinstate the original verdict against Crossan and reverse the partial verdict taken by Judge Patterson for the other eight officers.

As stated above, the trial before Judge Patterson was against all nine officers and concerned only the limited excessive force and battery claims. The judge submitted interrogatories to the jury and the jury returned a verdict finding officer Crossan liable for use of excessive force and finding the other eight officers not liable on both claims.[9] The jury awarded Kerman

9. Judge Patterson accepted a partial verdict with respect to the eight officers found not liable. Kerman now argues that this was error and prejudiced the jury's continued deliberations on Crossan's liability for excessive force. Because we are ordering a new trial on the excessive force claim against Crossan, any such error is harmless. Kerman also argues that Patterson's decision to accept a partial verdict was error because there is no authority for this procedure. We disagree. In the absence of authority prohibiting such a partial verdict in a civil case, and Kerman cites none, we believe that at the very least a

$75,000 and indicated that punitive damages were warranted. The following day, Judge Patterson expressed concern that the jury's answers to the special interrogatories concerning Crossan were inconsistent.[10] The jury found Crossan had used excessive force on Kerman after he was initially handcuffed (yes to question 1) and, on the battery charge, that he had made an offensive contact with Kerman (yes to question 3(a)). However, the jury also found, with respect to the battery charge, that Crossan did not intend to cause harmful physical contact (no to question 3(b)), and that he did not lack a legal justification for the contact (no to question 3(c)). The jury therefore found Crossan liable for excessive force but not liable on state law battery charges.

Judge Patterson decided the jury's answers were inconsistent and opted to return a clean verdict sheet to the jury with instructions to resolve the inconsistency between questions 1 and 3(b) and (c). Kerman objected, arguing that no inconsistency existed. After hearing argument from counsel, the judge subsequently concluded that the answers to questions 1 and 3(b) were not inconsistent. In the colloquy, the judge elaborated that while intent is an element of battery it is not an element of excessive force. As a result he amended his instructions and limited the jury's attention to the resolution of their answers to questions 1 and 3(c).

Kerman's counsel again objected to sending the verdict back for reconsideration. Counsel claimed that the response to 3(c) only concerned the battery charge and that, in 3(b) the jury had already decided that Crossan was not liable for battery. Thus, the answer to 3(c) was either irrelevant because it did not pertain to question 1, or was simply an affirmation of what had already been decided in 3(b). However, Judge Patterson adhered to his decision and instructed the jury to resolve the inconsistency between questions 1 and 3(c). Later, Judge Patterson accepted the jury's partial verdict finding Crossan not liable on the state law battery charge. While the jury continued to deliberate on the excessive force claim, Crossan renewed his motion for judgment as a matter of law. After receiving a number of notes from the jury indicating that there was little likelihood of a "unanimous decision" on the issue of excessive force, Judge Patterson granted Crossan's renewed motion on qualified immunity grounds and discharged the jury. Kerman now argues that Judge Patterson's decision to return the verdict to the jury with instructions to resolve the inconsistency between their answers to questions 1 and 3(c) was reversible error.

Defendants argue that Judge Patterson was well within his discretion in submitting the verdict for reconsideration. They reason that the battery and excessive force

trial judge, in the exercise of sound discretion, may follow such a course. We find no abuse of discretion here.

**10.** In particular, the jury answered "yes" to questions 1 and 3(a) while it answered "no" to questions 3(b) and (c). The relevant interrogatories read as follows:

1. Has plaintiff proved by a preponderance of the evidence that [defendant Crossan] intentionally or recklessly subjected the Plaintiff to excessive force after he was placed in handcuffs?

. . .

3. With respect to Plaintiff's claim for battery [did Crossan]

(a) make physical contact with Plaintiff in a hostile of offensive manner after he was detained?

(b) took such actions with the intention of causing harmful bodily contact?

(c) took such actions without legal justification?

claims were "substantially identical." In addition, both charges referred to a single course of conduct. As a result, defendants contend, the opposing answers to the interrogatories clearly presented a material inconsistency.

We agree with plaintiff that the battery and excessive force charges were not substantially identical. Under New York law, a claim for battery requires a showing of intent to cause bodily harm. *United Nat'l Ins. Co. v. Waterfront N.Y. Realty*, 994 F.2d 105, 108 (2d Cir.1993). By contrast, a Fourth Amendment claim for excessive force presents a "question [of] . . . whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, *without regard to their underlying intent or motivation.*" *Graham v. Connor*, 490 U.S. at 397, 109 S.Ct. 1865 (emphasis added).

■ However, a district judge has "broad discretion . . . to refuse to consider interrogatories answered in violation of the court's instructions." *Richard v. Firestone Tire and Rubber Co.*, 853 F.2d 1258, 1260 (5th Cir.1988). A judge may return a verdict for further consideration where "the answers are inconsistent with each other and one or more is likewise inconsistent with the general verdict. . . ." Fed. R.Civ.P. 49(b). This decision should be given deference on appeal because "the district judge . . . is in the best position to determine whether the answers reflect confusion or uncertainty." 853 F.2d at 1260.

■ On this standard we cannot say that Judge Patterson abused his discretion when he sent the verdict back to the jury for reconsideration. While plaintiff may

be able to provide a consistent explanation for the jury's answers, it was simply not unreasonable for the district court to conclude that an inconsistency existed. The issue of legal justification is pivotal for both battery and excessive force. The jury's finding of legal justification on the battery claim against Crossan could arguably draw into question the soundness of their verdict against Crossan on excessive force. Therefore, we find that the original verdict against officer Crossan should not be reinstated. Rather, as noted in Part II.C.2 supra, we order a new trial on, among other things, Kerman's claim against Crossan for excessive force. On remand, Kerman may once again argue to the jury that punitive damages are warranted.

### G. State law claims

As already noted, in addition to the battery claim, Kerman brought various state law claims against all nine defendants including false imprisonment and intentional infliction of emotional distress.[11] As to these, Judge McKenna granted summary judgment for all nine defendants. Kerman now contends that the district court's dismissal of these state law claims was error. In light of our discussion above we agree in part. We have decided in Part II.D above that the disposition of Kerman's Fourth Amendment and First Amendment claims regarding Crossan's decision to transport and commit him to Bellevue requires further fact-finding. If the facts are sufficient to allow Kerman to prevail on these claims, he may well also be entitled to submit to the jury his state law claims against Crossan of false imprisonment and intentional infliction of emotional

---

**11.** In connection with Kerman's state law claims, he argues in his principal brief to us that, to the extent that we remand for trial any "intentional tort claims" under state law, "the City should be held in as defendant." In its brief in response, the City does not appear to disagree.

distress. See *Bender v. City of New York*, 78 F.3d 787, 791 (2d Cir.1996) (in discussing allegations of battery and false imprisonment against police officers, we stated "if the jury resolved both these issues in favor of [defendant] ... then New York might well regard the officer's actions as sufficiently outrageous to satisfy the conduct element of the emotional distress tort.").

### III. Conclusion

For the reasons stated above, we affirm in part and reverse in part. In particular, we affirm Judge McKenna's grant of summary judgment to all nine defendant police officers on Kerman's Fourth Amendment claims regarding the officers' warrantless entry and their initial seizure and detention of Kerman, and Judge McKenna's grant of summary judgment for all defendants except Crossan on Kerman's First and Fourth Amendment claims regarding his hospitalization. Finally, we affirm Judge Patterson's acceptance of a partial verdict for eight of defendant police officers on Kerman's claims for battery and excessive force and the acceptance of a partial verdict for defendant Crossan on the claim for battery. We reverse Judge McKenna's grant of summary judgment for defendant Crossan on Kerman's Fourth Amendment claim for his involuntary hospitalization, his First Amendment claim alleging retaliation for protected speech and his state law claims for false imprisonment and intentional infliction of emotional distress. We also reverse Judge Patterson's decision to grant judgment as a matter of law to defendant Crossan on the issue of excessive force. We remand for further proceedings not inconsistent with this opinion on Kerman's claims under § 1983 against defendant Crossan based on the Fourth and First Amendments and on Kerman's state law claims against Crossan for false imprisonment

and intentional infliction of emotional distress.