14-2554-cv
Johnson v. Patterson

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2015

(Argued: December 11, 2015      Decided: April 11, 2016)

Docket No. 14-2554-cv

DAMANI JABARI MYERS,

*Plaintiff*,

and

JULIA JOHNSON,

*Plaintiff-Appellant*,

– v. –

POLICE OFFICER PATTERSON, Shield No. 658, 1st Pct,

*Defendant-Appellee*,

and

EDDIE JAMES MYERS, JR.; BENJAMIN MALEWICZ; JODI WEITZMAN-FISHER; JOHN CIAPOLI, Nassau County Attorney; KAREN MURPHY, Justice, Nassau County Supreme Court; DONNA GUARTON, Nassau County Baldwin, UFSD, Psychologist; ROBERT BARRIS, MD; G. ST. VICTOR, DR.; ARTHUR A. GIANELLA, President/CEO Nassau University Medical Center; CYRUS R. VANCE JR.,

*Defendants.*[*]

---

Before: JACOBS, LEVAL, and CALABRESI, *Circuit Judges*.

Appeal from the judgment of the United States District Court for the Eastern District of New York (Seybert, *J.*), Johnson v. Myers, No. 10-CV-1964(JS)(WDW), 2014 WL 2744624 (E.D.N.Y. June 16, 2014), granting summary judgment, on the basis of qualified immunity, in favor of Defendant-Appellee Police Officer Patterson.

Pursuant to an ongoing child neglect investigation, police officers and a Child Protective Services (CPS) caseworker arrived at Johnson's home one evening intending to interview her child. Johnson refused to allow CPS to talk to her son and allegedly stated that they would have to arrest her if they wanted to interview him. The police then arrested Johnson, who was ultimately involuntarily hospitalized.

The current record, which does not contain a statement from Officer Patterson, provides neither sufficient indicia of Johnson's dangerousness to herself or to others at the time of the seizure nor evidence that Patterson reasonably relied on the seemingly expert knowledge or instructions of another appropriate party in seizing Johnson. The record consists solely of contemporaneous notes from the CPS caseworker, which do not indicate that Johnson was a danger to herself, to her child, or to anyone else. We therefore vacate the judgment of the district court granting Officer Patterson qualified

[*] The Clerk of the Court is respectfully directed to amend the official caption in this case to conform with the caption above.

immunity on the existing record, and remand for expansion of the record as to the grounds on which the arrest was made, and for reevaluation of Patterson's entitlement to qualified immunity on the basis of an expanded record.

---

Loraine M. Cortese-Costa, Law Offices of Loraine M. Cortese-Costa, Bridgeport, CT, *for Plaintiff-Appellant.*

Robert F. Van der Waag, Deputy County Attorney *for* Carnell T. Foskey, Nassau County Attorney, Mineola, NY, *for Defendant-Appellee.*

---

CALABRESI, *Circuit Judge*:

The case before us concerns Plaintiff Julia Johnson's appeal from the district court's grant of qualified immunity to Defendant Police Officer Patterson. The district court dismissed Johnson's claim against him by reason of his having seized her for psychiatric evaluation based on her supposed dangerousness to her son DJM.

In response to reports from DJM's school that DJM's mother was behaving in an irrational manner, Nassau County Child Protective Services (CPS) opened an investigation, led by CPS caseworker Jodi Weitzman. As a result of her investigation, Weitzman eventually summoned police to meet her at Johnson's home, where according to notes from the record, she and Officer Patterson "agreed that mo[ther] should be sent for a psych eval as her behavior was irrational."

We are now called on to decide whether Officer Patterson is entitled to qualified immunity, thereby barring Johnson's claim that he violated her Fourth Amendment rights by arresting her. Unfortunately, the record evidence of what happened that evening consists only of the terse notes of the CPS caseworkers. And those notes lack indicia of, or specific observations substantiating, Johnson's "dangerousness"; nor do they show that Patterson reasonably relied on communications from Weitzman or others in making the seizure. Moreover, and notably, there is no statement by Patterson in the record.

On the current record, we cannot affirm the district court's grant of qualified immunity to Officer Patterson on Johnson's claim. Without evidence regarding the grounds for Patterson's decision, we are unable to determine whether his actions were contrary to clearly established law. Accordingly, and without considering the many unresolved legal questions in this area, we vacate the district court's grant of qualified immunity and remand to the district court for further expansion of the record as to the basis on which the arrest was made, and for reevaluation of Patterson's entitlement to qualified immunity on the basis of an expanded record.

## BACKGROUND

The case before us arises from the involvement of Officer Patterson in the August 20, 2008 seizure and involuntary hospitalization of Plaintiff-Appellant Julia Johnson. Patterson arrested Johnson in the course of an attempted interview of Johnson's son

4

pursuant to a CPS neglect investigation. Caseworker notes from that CPS investigation constitute the factual corpus underlying both Patterson's motion for summary judgment and our description of the investigation and subsequent events leading to Johnson's seizure. These notes are essentially contemporaneous records of the course of the CPS investigation, with entries recorded the day they occurred, or within a few weeks. Weitzman, a CPS caseworker who was actively involved in the investigation of Johnson and who was present during Johnson's arrest, made the majority of the entries.

*The Investigation*

On June 20, 2008, an employee at DJM's school called the New York state child abuse hotline to allege that Johnson was acting oddly and to express "concern that there would be no one to check on [the] child." Caseworker Notes, Dist. Ct. Dkt. No. 155-3, at 2; *Johnson v. Myers*, No. 10-CV-1964(JS)(WDW), 2014 WL 2744624, at *1 (E.D.N.Y. June 16, 2014). According to the caseworker notes, the caller stated that the mother (i) had refused to sign emergency contact cards with a home phone number for DJM, (ii) had refused to sign permission slips for school trips, (iii) had written letters to the FBI with the school cc'ed, (iv) had "attended an award assembly where she only took notes," (v) had made "unusual inquiries about other children" at the school, and (vi) had grown

"furious" with the school when DJM's father picked him up, demanding to see the father's signature. Caseworker Notes, Dist. Ct. Dkt. No. 155-3, at 2.[1]

On the same day as the school employee's call, Weitzman tried to contact Johnson by going to her home, and she was able to meet with DJM's father, Eddie Myers, Jr., at the home. According to the caseworker notes, Myers responded to the allegations against Johnson by stating that DJM was "safe with" Johnson. He elaborated that while Johnson had "her moments," they were "never toward" DJM. Myers "stated [that] [Johnson] does not get physical when she gets angry." Rather, according to Myers, Johnson was "like supermom," and Myers believed "that everything she does [was] in [DJM's] best interest." Weitzman also observed the home to be "very clean and appropriate" and to contain an "ample food supply." *Id.* at 3.

Two days later, CPS returned to Johnson's home and the notes reflect what appears to be CPS's first face-to-face contact with Johnson. While Johnson initially refused to grant CPS's request to speak with DJM, she relented somewhat, allowing the caseworker at least to see the child, who "indicated that he did not want to be interviewed." *Id.* at 4. Moreover, in contrast to Myers's earlier characterization of Johnson just two days before, Myers now stated that "this behavior," seemingly

---

[1] The caseworker notes mention that the caller did not say that the child, DJM, reported any "unusual behavior of [Johnson]," and the family apparently had no prior CPS investigatory history. Dist. Ct. Dkt. No. 155-3, at 2.

referring to Johnson's obstinate actions towards CPS caseworkers, was "typical of Johnson and very upsetting to [DJM] and to him."[2] *Id.*at 4.

From June to August 2008, CPS caseworkers, including but not limited to Weitzman, made multiple further attempts to speak to Johnson, who was either not there, not answering the door, or not willing to talk.[3]

*The Seizure*

On August 20, 2008, Johnson was arrested and eventually taken to Nassau University Medical Center (NUMC) against her will. Weitzman's notes comprise the only evidence in the record about that day.

Because the notes, written in shorthand, play such a primary role and are terse, we reproduce the relevant section describing the arrest in its entirety, with all emphasis our own:

> C[ase]w[orker] [Weitzman] contacted police when she arrived at [Johnson's home]. [Myers] met with c[ase]w[orker] outside of the home. PO Patterson #658 and PO Barret[t] #476 arrived at the home. [Myers] let police and caseworker into the home. [Johnson] was annoyed and stated she and [DJM] were on their way out to an appointment and did not have time to talk. C[ase]w[orker] told [Johnson] she [the caseworker] needed to

---

[2] According to the notes, Myers also said "he does not know if [Johnson] has mental issues" but does think she "could use therapy." Dist. Ct. Dkt. No. 155-3, at 2-3.

[3] For example, on June 23, 2008, Johnson was not home, but the caseworkers made contact with a neighbor, who described Johnson as "nice enough" – the neighbor explained that she often "see[s] Johnson in the front yard . . . playing ball with her son." Dist. Ct. Dkt. No. 155-3, at 5. The neighbor emphasized both Johnson's happiness when DJM recently won an award as well as her overall impression of Johnson as a "nice person." *Id.* On August 13, 2008, CPS caseworkers were able to find Johnson at home, but according to the caseworker notes, Johnson was "suspicious of," and "refused to talk with," the caseworker. Johnson was apparently "difficult to follow as she kept going from one subject to another." *Id.* at 7.

talk with [DJM] for a few moments. [Johnson] refused. [Johnson] stated that she doesn't always hear the doorbell and *denies having strange behavior*. PO also tried to get [Johnson] to allow c[ase]w[orker] to talk to [DJM]. [Johnson] insisted that she had an appointment and got *annoyed*. [*Johnson*] *stated that the police would have to arrest her if they wanted to have [DJM] interviewed.* C[ase]w[orker] and police tried to calm [Johnson] down. [Johnson] was *very uncooperative*. [Johnson] started to act *irrational* and was telling [DJM] not to talk with c[ase]w[orker]. PO and c[ase]w[orker] agreed that [Johnson] should be sent for a psych eval as her behavior was *irrational*. Police called the NC paramedics. Paramedic Goldstein #148 ambulance #2351 arrived at the home. [Johnson] was evaluated and transported to NUMC for psych[ological] eval[uation]. [Johnson] was uncooperative to paramedic.

C[ase]w[orker] manage[d] to speak with [DJM] briefly. [DJM] stated that [Johnson] makes him meals, breakfast-waffles or french toast and sandwiches or hot dogs for lunch. [DJM] stated [Johnson] does not hit him. [DJM] was fearful to talk to c[ase]w[orker] so c[ase]w[orker] ended the interview.

*Id.* at 9 (emphasis added).

The caseworker notes thus indicate that Johnson, despite denying that her behavior was "strange," was perceived to be "annoyed," "very uncooperative," and "irrational," and that the child was "fearful" of talking to the caseworker. At that point, "PO and c[ase]w[orker] agreed that [Johnson] should be sent for a psych[ological] eval[uation] as her behavior was irrational."[4] Officer Patterson then arrested her.

---

[4] The Defendants' Rule 56.1 statement, accompanying the motion for summary judgment and relying on the caseworker notes, states that after "CPS caseworker Jodi Weitzman and the police officers became concerned for Plaintiff Julia Johnson and [DJM's] health [and] safety," "[i]t was decided that Plaintiff Julia Johnson should be sent to NUMC for a psych evaluation." Def. Rule 56.1 Statement, Dkt No. 156, ¶8. Beyond the above listed descriptions of her behavior, the statement provides no elaboration as to what specifically inspired the concern for the safety of Johnson and DJM. Patterson's counsel's Rule 56.1 statement that "Weitzman and the police officers became concerned for Plaintiff Julia Johnson and [DJM's] health [and] safety" was not supported by any evidence in the record and, therefore, cannot be

*Procedural History*

Johnson began this action in 2010. The district court construed her *pro se* complaint as stating allegations against a large number of individuals, including Patterson, based on a violation of her Fourth Amendment and Fourteenth Amendment rights. As particularly relevant to the instant appeal, Johnson's complaint alleged that she "was falsely arrested and unlawfully held by PO Patterson, . . . handcuffed and informed by PO Patterson that he was placing [Johnson] under arrest, . . . never informed by PO Patterson why he was arresting [Johnson], . . . [and] transported while still in handcuffs to Nassau University Medical Center." Complaint at 3.

With respect to Johnson's false arrest claim against P.O. Patterson, the district court concluded:

> According to the County Defendants, Plaintiff was extremely agitated, would not allow Weitzman to speak with DJM, and displayed increasingly irrational behavior. For example, Plaintiff would not allow Weitzman to speak with DJM unless Officers P[a]tterson and Barrett arrested her. Based on their assessment of Plaintiff's behavior, Weitzman and the police officers believed that Plaintiff *was a danger to herself* and DJM and the police officers therefore decided to send Plaintiff to the NUMC Psychiatric Unit for a psychiatric Evaluation.

*Johnson*, 2014 WL 2744624, at *2 (emphasis added) (citations omitted).[5]

Although Johnson filed a "Statement of Material Fact Responses" in opposition to the motion for summary judgment, Johnson's Statement did not, in the district

relied on to support a finding of qualified immunity. *See Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003).

[5] To support this version of the alleged events, the district court cited to both Paragraph 8 of Defendants' Rule 56.1 Statement and the caseworker notes.

9

court's view, specifically address the material facts or contain citations to the evidence. Because, as the district court put it, "Plaintiff failed to file a proper 56.1 Counterstatement," and had also failed to abide by other procedural rules "despite adequate notice," the district court found "as true the facts contained in Defendants' 56.1 Statements to the extent that they are supported by admissible evidence." *Johnson*, 2014 WL 2744624, at *1 n.1. Unsurprisingly, however, Johnson's counterstatement specifically denied that her conduct demonstrated the risk of harm to herself or others that is necessary to justify the seizure and involuntary hospitalization.

On this basis, the district court found that P.O. Patterson was entitled to qualified immunity and granted him summary judgment. Prior to doing so, the court did, however, determine that the defendant did not provide evidence that either P.O. Patterson or Weitzman witnessed Johnson "threaten her own life" or that Johnson "'manifested homicidal or other violent behavior placing' DJM at risk of serious physical harm." *Id.* at *10.

The district court's use of "homicidal or other violent behavior" refers to the language of N.Y. Mental Hyg. Law § 9.41, which governs emergency admissions of one "who appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others." *Id.* The New York statute further defines "likely to result in serious harm" such that the legal standard for detention of the parent, by reason of risk of harm to the child, depends on "substantial

risk of *physical* harm . . . as manifested by *homicidal* or other *violent behavior* by which [the child is] placed in reasonable fear of serious *physical* harm." N.Y. Mental Hyg. Law § 9.01 (emphasis added); *see also Kerman v. City of New York,* 374 F.3d 93, 100 (2d Cir. 2004) ("We interpreted [New York law] as imposing the same objective reasonableness standard that is imposed by the Fourth Amendment." (internal quotation marks omitted)).

In this respect, it is significant that the standard for involuntary detention of the parent is different from the standard for removal of the child from the parent. Thus, a police officer may take a child into emergency, protective custody, even in the absence of a court order, if the officer "has reasonable cause to believe that the child is in such circumstance or condition that his or her continuing in said place of residence or in the care and custody of the parent . . . presents an imminent danger to the child's life or health." N.Y. Fam. Ct. Act § 1024. And, the risk of harm to the child need not result from violence. But to seize a "mentally ill" parent, danger of physical violence is needed.

The court nonetheless granted qualified immunity to P.O. Patterson, concluding that, "based on Officer Patterson's observations and the fact that he was accompanying Weitzman to Plaintiff's home as part of a continuing CPS investigation of allegations of child neglect, it was objectively reasonable to believe that Plaintiff posed a danger to

11

herself and DJM." *Id.* at *11.[6] The court also granted motions to dismiss or motions for summary judgment on all of Johnson's claims against the other defendants.

A panel of our court considered Johnson's appeal and her motions for *in forma pauperis* ("IFP") status and appointment of counsel; that panel dismissed all of her claims except the appeal from the grant of qualified immunity to Officer Patterson, and, as to that claim, appointed counsel.

**DISCUSSION**

We review a district court's grant of summary judgment *de novo* to determine whether the district court properly concluded that there was no genuine dispute as to any material fact, such that the moving party was entitled to judgment as a matter of law. *See Miller v. Wolpoff & Abramson*, L.L.P., 321 F.3d 292, 300 (2d Cir. 2003). We do so "resolving all ambiguities and drawing all factual inferences in plaintiff['s] favor as the non-moving party." *Anthony v. City of New York*, 339 F.3d 129, 134 (2d Cir. 2003).

**I**

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. This protection adheres whether the seizure is for purposes of law enforcement or due to an individual's mental illness. "[A]ssuming that the term 'mental illness' can be

---

[6] The district court additionally wrote that "it cannot say that no rational jury could find that Officer Peterson lacked probable cause to believe that Plaintiff was acting in a manner that would justify" a mental-health seizure. *Johnson*, 2014 WL 2744624, at *10.

given a reasonably precise content and that the 'mentally ill' can be identified with reasonable accuracy, there is still no constitutional basis for confining such persons involuntarily if they are dangerous to no one and can live safely in freedom." *Rodriguez v. City of New York,* 72 F.3d 1051, 1061 (2d Cir. 1995) (quoting *O'Connor v. Donaldson*, 422 U.S. 563, 575 (1975)) (alterations omitted). To handcuff and detain, even briefly, a person for mental-health reasons, an officer must have "probable cause to believe that the person presented a risk of harm to [her]self or others." *Kerman v. City of New York*, 261 F.3d 229, 237 (2d Cir. 2001)*; see also Green v. City of N.Y.*, 465 F.3d 65, 83-84 (2d Cir. 2006) (likewise requiring a showing of dangerousness for seizure and transportation to a hospital for treatment).

Governmental actors, including police officers, enjoy qualified immunity from suit for constitutional violations under 42 U.S.C. § 1983. "A state actor charged under § 1983 with violating a plaintiff's constitutional rights is entitled to have the action dismissed on the basis of qualified immunity if at the time of the challenged conduct there was no 'clearly established law' that such conduct constituted a constitutional violation." *Lynch v. Ackley*, 811 F.3d 569, 578 (2d Cir. 2016) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). And qualified immunity attaches if it was "objectively reasonable for [the officer] to believe that his actions were lawful at the time of the challenged act." *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995) (internal quotation marks and citation omitted).

13

In the context of a false arrest claim, qualified immunity protects an officer if he had "'arguable probable cause' to arrest the plaintiff." *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2014). "Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (internal quotation marks omitted). In other words, an officer lacks arguable probable cause and is not entitled to qualified immunity only where "no officer of reasonable competence could have made the same choice in similar circumstances." *Lennon*, 66 F.3d at 420-21. "The doctrine of qualified immunity serves to protect police from liability and suit when they are required to make on-the-spot judgments in tense circumstances" and when their actions could reasonably be seen as lawful. *Id.* at 424.

*Kerman v. City of New York* makes clear that, to determine whether a mental-health seizure is justified by arguable probable cause, a court must review the specific observations and information available to the officers at the time of a seizure. In that case, this court reversed a grant of qualified immunity at the summary-judgment stage for a plaintiff's detention and subsequent hospitalization. Officers had responded to an anonymous 911 call stating that a mentally ill man was off his medication, acting "crazy," and possibly had a gun. *Kerman*, 261 F.3d at 232. After an hour-long detention of Kerman and search of his apartment, it was clear that there was no firearm. *Id.* at

14

240. The police nonetheless continued to detain Kerman and transported him to Bellevue Hospital. *Id.* at 241.

In reversing the district court and remanding for further proceedings, we emphasized that while "the police may have been entitled to hospitalize Kerman if his conduct or the condition of his apartment demonstrated a dangerous mental state," there were genuine disputes as to those material facts. The police claimed that Kerman was ranting and raving and that the apartment was, as the district court put it, a veritable "Augean stable," whereas Kerman, in contrast, claimed he was acting "in a calm, if irritated, manner" and that the apartment was, "at worst, untidy." *Id.* at 241. This court remanded for jury factfinding to resolve precisely what the officers could have observed of Kerman's home and behavior.

**II**

We cannot affirm the district court's grant of qualified immunity in the instant case because the record provides insufficient detail to make a probable cause determination. The district court based its ruling on the fact that "Officer Patterson's observations" could have offered him reason to believe that Johnson was dangerous to herself or to others. As we discuss below, however, there is, in the current record, insufficient evidence to support the conclusion that Patterson's observations either could reasonably have led him to that conclusion, or that they did.

15

## A. Patterson's Personal Judgments and Observations

We have no ability to glean the content of Officer Patterson's observations from the record before us. Patterson provided no statement to the court below. Instead, the motion for summary judgment relies solely on the caseworker notes, which describe Johnson as "annoyed," "very uncooperative," and "irrational," but do not say that she appeared dangerous. The sole specific behavior mentioned in the caseworker notes was Johnson's refusal of CPS's request to interview DJM, with Johnson allegedly "stat[ing] that the police would have to arrest her if they wanted to have [DJM] interviewed."

A person may be annoyed, uncooperative, and irrational without presenting a danger to herself or of violence to others. Nor does Johnson's refusal to allow her child to be interviewed by authorities establish arguable probable cause to believe Johnson presented a risk of serious physical harm resulting from violent behavior. A parent's refusal to allow police to interview her child does not (by itself or inevitably) support an inference that the child is at risk of serious physical harm from violence of the parent.

Needless to say, appropriate reports of dangerous behavior might well justify a seizure. But the sketchy reports in the district court record do not support a reason for Johnson's seizure. Rather, Patterson argues that "the actual witnessing of the actions of the appellant and the atmosphere o[f] the home [may have] formed the actual basis for the officer's conclusion." Patterson Br. 11.

16

It is, of course, quite possible, that Officer Patterson made observations of Johnson's dangerousness that would support arguable probable cause to arrest her. But the unsworn argument of an officer's attorney cannot substitute for record evidence. If the observations are in fact as indispensable as Patterson's brief appears to concede, we do not deem it overly demanding to require the officer to submit a sworn statement reflecting his "actual witnessing of the actions of the appellant and atmosphere o[f] the home."

**B. Reliance on Others' Judgments and Observations**

The sparseness of the record is illustrated by the fact that we cannot determine whether Patterson made an independent decision to arrest Johnson, or relied on what he was told by Weitzman, or any combination of the two. Patterson is protected by qualified immunity if Weitzman somehow communicated to him a message that Patterson could have reasonably understood as Weitzman's expression of her professional judgment that Johnson should be seized for psychiatric evaluation because of danger of serious physical harm to the child resulting from Johnson's violence. Weitzman need not have expressed the complete thought beyond giving a go-ahead for the arrest, so long as Patterson could reasonably have understood Weitzman's go-ahead to be based on Weitzman's professional appraisal of information she possessed.

While it is not clear under New York law whether a caseworker, such as Weitzman, is endowed with presumed qualification to evaluate the risk that someone

17

will engage in violent behavior, that lack of clarity in New York law entitles Patterson to qualified immunity if he reasonably relied on Weitzman's communication of her professional judgment.

The issue to be considered on remand is whether, under the law as it existed at the time, Patterson acted reasonably in seizing Johnson. That reasonableness could be based on either of two sets of circumstances, or any combination of them: (1) any factual information possessed by Patterson (regardless of whether that information comes from his own personal observation or from a reliable source, including Weitzman) that reasonably supported a belief that the child was at substantial risk of serious physical harm resulting from Johnson's violence; and (2) as noted above, Weitzman's communication of her professional judgment that Johnson should be seized for psychiatric evaluation. Even if, in actuality, Weitzman did not possess the authority or knowledge to make the judgment, Patterson would nonetheless be shielded by qualified immunity if a reasonable officer in the circumstances would have relied on Weitzman's directives and seeming knowledge. As the Seventh Circuit aptly noted, "Fear of personal liability if the [original direction or information] turns out to be erroneous would interfere with valuable institutions of law enforcement[, and g]iving the arresting officer immunity would shift the liability back to the person who issued the erroneous instructions . . . , simultaneously protecting all of the interests involved." *Gordon v. Degelmann*, 29 F.3d 295, 300 (7th Cir. 1994).

We need not contemplate further permutations or delve any deeper into the above mentioned ones. We raise these possibilities and their general place in the framework of qualified immunity to emphasize the absence of crucial facts in the current record. And while development of those facts may well protect Patterson from trial and from liability for Johnson's alleged civil rights violations, we cannot, without a more substantive record, grant Patterson qualified immunity at this time.

Since more evidence regarding the encounter, including Patterson's observations, the roles played by Weitzman and the other officer, and the reasonableness of any reliance on Weitzman, might support arguable probable cause to arrest Johnson, we remand to the district court to examine further what occurred that led to Johnson's seizure. Johnson, however, asks us to go further, arguing that she is entitled to judgment in her favor on the false arrest claim. She contends that her "seizure and hospitalization was objectively unreasonable in the face of clearly established law and undisputed facts." Johnson Br. 17. We reject this argument on the same ground that precludes us from granting Patterson qualified immunity. The record is not sufficiently clear.[7]

---

[7] We do, however, believe that an appropriate resolution of the qualified immunity issue would benefit from the appointment of counsel by the district court. This court recently "encourage[d] the district court, on remand, to seriously consider affording [Plaintiff] appointed counsel" after vacating the district court's grant of summary judgment on a formerly *pro se* plaintiff's action stemming from detention-related constitutional violations. *Willey v. Kirkpatrick*, 801 F.3d 51, 71 (2d Cir. 2015). Similarly, in the present case, in making our suggestion to the district court that counsel be appointed, we note the complexities inherent in the law of mental health seizures and the need to investigate facts further. *See*

19

**III**

Johnson was eventually subjected to involuntary psychological evaluation and was determined to be a danger to herself and to others. Our analysis, however, is not affected by the fact that Johnson was found to be dangerous *subsequent* to her seizure. Upon being admitted involuntarily, Johnson was diagnosed with a delusional disorder and paranoid schizophrenia. *Johnson*, 2014 WL 2744624, at *3. She told the hospital staff that she had attempted suicide. *Id.* Johnson also reported that at one point, she locked herself and DJM in DJM's bedroom in the middle of the night and made him push a heavy desk against the door because Johnson was afraid of Myers. *Id.* Accordingly, based on her suicide attempt and her paranoia, guardedness, and suspiciousness, she was deemed a danger to herself and to others. *Id.*

Shortly thereafter, in October of 2008, CPS filed a neglect petition against Johnson pursuant to the New York State Family Court Act. Two days later, Johnson underwent a second involuntary hospitalization and refused antipsychotic medications, leading the state court to order forced medication. She was released after a brief period, once she was no longer believed to be a danger to herself or to others. *Johnson*, 2014 WL 2744624, at *4.

---

*Hodge v. Police Officers*, 802 F.2d 58, 61–62 (2d Cir. 1986) (listing factors to be considered in a district court's decision to appoint counsel).

Johnson's parental rights were eventually severed. In 2009, the New York Family Court granted CPS's neglect petition and adjudged DJM to be a "neglected child" as defined under New York family law. *Id.* at *4. In 2010, the family court placed DJM under the supervision of the Nassau County Department of Social Service, granted custody to Myers, and issued an Order of Protection instructing Johnson to stay away from DJM.[8] *Id.* at *4.

These facts certainly strengthen the possibility that Weitzman or P.O. Patterson did observe something on the evening of Johnson's seizure from which they could legitimately find her to be dangerous. But however prescient the officer's instincts may have been, we cannot grant immunity for decisions merely because *ex post* they seem to have been good ones, any more than we could hold officers liable for decisions that seemed reasonable when made but subsequently turned out to be wrong. Of course, courts must be sympathetic to the complicated institutional environments in which police officers are called on to execute difficult duties. Nevertheless, we must judge their actions by the facts as observed at the time they acted. As a result, we require, at this juncture in this case, a more complete record to determine whether in the end a grant of qualified immunity for Patterson is appropriate.

Given that Patterson, upon his motion for summary judgment on qualified immunity, has failed to show facts that would entitle him to qualified immunity, we

---

[8] Johnson did not appeal the Family Court orders, despite being told she could, but some of her claims in this lawsuit, as originally brought, did address the orders. *Johnson*, 2014 WL 2744624, at *4.

would ordinarily simply reverse the grant of qualified immunity and remand for trial. But, in view of the fact that the record was so inadequately developed by counsel, and simply failed to set forth the basis for the arrest, we think the purposes of qualified immunity would be better served by a remand for further development of the record and reconsideration of the question in light of the expanded record.

## CONCLUSION

Johnson's seizure, and her struggles to care for herself and her loved ones, exemplify the challenges of policing when both mental health and child welfare issues are central. There may well be reasons for an effort to interview a child to escalate into the seizure of the child's parent, but such reasons must be properly made part of the record and presented to the court before qualified immunity can attach. To date this has not been done in this case. We therefore **VACATE** the judgment of the district court and **REMAND** the case to that court for further proceedings consistent with this opinion.