20-4002-cv
*Guan v. City of New York*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2021

(Argued: January 14, 2022     Decided: June 17, 2022)

Docket No. 20-4002-cv

KAIBIN GUAN,

*Plaintiff-Appellant,*

*v.*

CITY OF NEW YORK, OFFICER PETER BOYLE, SHIELD #18572, IN HIS INDIVIDUAL AND
OFFICIAL CAPACITIES, OFFICER LUIS LARASAAVEDRA, SHIELD #19150, IN HIS
INDIVIDUAL AND OFFICIAL CAPACITIES,

*Defendants-Appellees.*[*]

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

Before:     POOLER, CHIN, and CARNEY, *Circuit Judges.*

---

[*]     The Clerk of Court is respectfully directed to amend the official caption to
conform to the above.

Appeal from a judgment of the United States District Court for the Southern District of New York (Daniels, *J.*) dismissing the amended complaint. Following a disturbance at a hospital, two New York City police officers arrested plaintiff-appellant and transported her to another hospital for a psychiatric evaluation. Plaintiff-appellant asserted false arrest claims, alleging that the police officers lacked probable cause to arrest her for a mental health examination. The district court granted defendants-appellees' motion for summary judgment, holding that because the police officers had probable cause to arrest plaintiff-appellant for a misdemeanor trespass, her false arrest claim was precluded. The district court did not reach the issue of the existence of probable cause for a mental health arrest. The district court also held, in the alternative, that the officers were protected by qualified immunity because they had arguable probable cause to make a mental health arrest. While we conclude that the district court erred in its probable cause analysis, we agree that the officers were protected by qualified immunity.

AFFIRMED.

———————————————

NICOLE D. VALENTE (Arian Soroush, *on the brief*),
Cravath, Swaine & Moore L.L.P., New York, New
York, *for Plaintiff-Appellant*.

KEVIN OSOWSKI (Richard Dearing and Jeremy W.
Shweder, *on the brief*), *for* Georgia M. Pestana,
Corporation Counsel of the City of New York,
New York, New York, *for Defendants-Appellees*.

CHIN, *Circuit Judge*:

On November 13, 2017, New York City police officers took the 21-year-old autistic son of plaintiff-appellant Kaibin Guan into custody for an assessment of whether he required protective services. He was admitted to a nearby hospital for an emergency psychiatric examination. Guan was not present when her son was removed. She went to the hospital to find him, and although she remained there for hours, she was not permitted to see him. At one point, hospital security removed her from the premises; she returned and then refused to leave. Eventually, New York City police officers arrested her. She was transported directly to a different hospital, where she was subjected to a psychiatric evaluation. She was released about three hours later -- without being charged with any crime.

3

Guan brought this action below, suing defendants-appellees City of New York (the "City") and Peter Boyle and Luis Larasaavedra, the two arresting police officers, seeking damages for false arrest pursuant to 42 U.S.C. §§ 1981 and 1983. The district court granted defendants summary judgment pursuant to Federal Rule of Civil Procedure 56(b) and dismissed Guan's amended complaint, holding that the officers had probable cause to arrest her for misdemeanor trespass and that therefore the false arrest claims were precluded. The district court did not address whether the officers had probable cause to make a mental health arrest. It also held, in the alternative, that the officers were protected by qualified immunity because they had arguable probable cause to make a mental health arrest.

We hold that the district court erred in its probable cause analysis, but we conclude that the officers were indeed protected by qualified immunity. Accordingly, we affirm.

4

## STATEMENT OF THE CASE

### A.     The Facts

The facts are construed in the light most favorable to Guan.

Guan is a single mother and primary caretaker of her autistic son, Alfred, who was 21 years old at the time of the incident.[1]  Alfred has limited speech capabilities and is unable to leave home by himself due to his autism.  A homecare worker assists Guan with her son.

On November 13, 2017, as Guan was preparing to leave for work, New York City police officers and caseworkers from the New York City Adult Protective Services Program arrived at Guan's apartment.  They presented Guan with an order authorizing the officers and caseworkers "to conduct an evaluation" to determine whether Alfred required adult protective services.  Joint App'x at 348.  Guan did not understand the order to permit Alfred's removal from the apartment, and because she needed to leave for work, Guan left Alfred at home with the homecare worker for the evaluation.  Soon thereafter, however,

---

[1]     Guan was approximately 51 years old at the time of the incident.  She is 5'4" tall and weighs approximately 145 pounds.  She was educated in China, came to the United States in 1994, and worked as an interpreter and as a translator of documents in the science and technology fields.

5

Guan was notified by the homecare worker that her son had been removed from the home.

The homecare worker did not speak English and was unable to tell Guan where her son had been taken. Guan concluded, however, that he had been taken to Mount Sinai West ("Mount Sinai"), formerly the Roosevelt Hospital in Manhattan. She immediately went there. When she arrived around 11 a.m., a social worker and psychiatrist at Mount Sinai showed Guan a document advising that Alfred had been admitted for an emergency psychiatric examination. The document, entitled "Notice of Status and Rights -- C.P.E.P. [Comprehensive Psychiatric Emergency Program] Emergency Admission," was addressed to Alfred and advised that:

> Based upon an initial examination by a staff physician, you have been admitted as an emergency-status patient to this [C.P.E.P.] for immediate observation, care and treatment. Within 24 hours of the time you are received in the C.P.E.P. emergency room, you will be examined by another physician, who is a member of the psychiatric staff of the C.P.E.P. If he or she confirms the first physician's findings, you will then be moved to an extended observation bed and may be kept in the C.P.E.P. for a period of up to 72 hours from the time you are received in the emergency room.

6

*Id*. at 12. The notice further advised that legal assistance through Mental Hygiene Legal Services was available to the recipient and his representative or family. *Id*.

Guan repeatedly asked hospital personnel to see her son, explaining that he had severe autism, but her requests were denied or ignored. She "panicked because she worried about what might happen to her son if he were admitted to a psychiatric ward, given his autism, and the behavior that could result from his commitment." *Id*. at 343. Around 3:15 p.m., Guan called 911. Officers Boyle and Larasaavedra responded to the 911 call and spoke to Guan at Mount Sinai. Guan explained that her autistic son had been removed from her home, she had been unable to see him, and she was worried about his safety. She told the officers that she was "'concerned' that her adult autistic son had been 'provoked or hit . . . even rape[d]' inside the hospital's psychiatric ward." *Id*. at 336. Boyle testified that Guan was "irate," "shaking," and "visually very upset." *Id*. at 65. He observed that she said "over and over" that "the government took her kid, that her child was kidnapped, that we [the officers] are helping the hospital kidnap her kid." *Id*.

7

Larasaavedra spoke with Mount Sinai personnel about Alfred and his living conditions, although he does not recall the details of the conversations. The officers then left without taking any further action. They did not provide any information to Guan as to Alfred's whereabouts or safety, despite her inquiries and concerns. The officers instructed Guan not to continue to ask hospital personnel about Alfred and warned her that if she failed to comply "they would come back and take her away." *Id*. at 344.

After the officers left, Guan grew increasingly worried about Alfred. She felt "'scared' and 'hopeless' because she feared that 'horrible' things might happen to her son." *Id*. at 344. Although she had been led earlier to believe that she could see her son at 6 p.m., as 6 p.m. approached, hospital staff told Guan, without explanation, that she would not be permitted to see Alfred that day. Just after 6 p.m., hospital security "forced" Guan to leave the premises. *Id*. Guan remained in the vicinity and after a period of time, feeling "very cold and desperate," called 911 again about her son. *Id*. She asked the 911 operator not to send Boyle and Larasaavedra. Guan then re-entered Mount Sinai and informed hospital security that she was there to await the police. She did not raise her

8

voice, act rudely, or behave badly. At that point hospital security called 911 and reported that Guan was at Mount Sinai and trespassing.

Boyle and Larasaavedra returned to Mount Sinai around 8 p.m. and met Guan and hospital staff in the emergency room. Larasaavedra spoke to a doctor in the emergency room about Guan. As Guan has acknowledged, the doctor (not identified by name) told Larasaavedra that Guan was "emotionally disturbed, and that she needed to be seen by a psychiatrist, because of 'the way she was acting.'" *Id*. at 345.[2] The doctor told Larasaavedra that "the hospital wanted Ms. Guan out of the emergency room because 'they couldn't take her anymore in there.'" *Id*. Hospital personnel told Larasaavedra that Guan "was in their faces, yelling, screaming," and disruptive not only to the security guards but also to the "people behind the desk." *Id*. at 77.[3] The officers then handcuffed

---

[2]      Larasaavedra testified that "they" (referring to hospital personnel) told the officers that Guan "needed to be hospitalized and seen by a doctor," and that she was an "EDP" -- an emotionally disturbed person. Joint App'x at 78, 79. While it is true that Larasaavedra could not recall who made these comments, the substance of the comment is not substantially different from what Guan conceded the officers were told in her Rule 56.1 counterstatement of material facts.

[3]      Boyle testified that, at least during their second encounter, Guan was "yelling" and "screaming," Joint App'x at 65, 68, but Guan denies that she yelled or screamed, *id*. at 345, and so we assume she did not. Even assuming she had not been yelling and screaming, however, this is what hospital personnel told the officers. In these circumstances, it was not unreasonable for the officers to accept and rely upon these representations. *See Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000).

9

Guan, removed her from Mount Sinai, and called for an ambulance to transport her to a different hospital. At that point, she had been at Mount Sinai (or in the vicinity) for approximately nine hours. Larasaavedra made a note at 8:01 p.m.: "female incoherent, irrational," but "non-violent." *Id*. at 345.

Emergency medical technicians ("EMTs") then transported Guan to another hospital, Metropolitan Hospital Center ("Metropolitan"), where she was subjected, without her consent, to an emergency psychiatric evaluation. The EMTs noted in their report that they had been advised by Mount Sinai that Guan's "son was removed from [Guan's] residence by Adult Protective Services because of unsanitary living conditions." *Id*. at 86.[4] They further reported that while Guan denied hallucinations and any suicidal or homicidal ideation, she claimed that her "son is being raped while in [Mount Sinai] as she's being detained by NYPD." *Id*. After a psychiatric evaluation at Metropolitan, Guan was discharged at 11:33 p.m. She was never charged with trespass or any other crime. She was not able to see her son until 2 p.m. the next day.

---

[4] The officers were also told about concerns of unsanitary conditions in Guan's home, that the home was "unlivable, because [Guan] was a hoarder." Joint App'x at 74.

**B.    The Proceedings Below**

On March 16, 2018, proceeding *pro se*, Guan commenced this action against the City and the officers alleging false arrest.  On August 8, 2018, she filed an amended complaint, *pro se* but with assistance from a legal clinic, asserting false arrest claims pursuant to 42 U.S.C. §§ 1981 and 1983 against the City and Officers Boyle and Larasaavedra.[5]  In November 2018, *pro bono* counsel (attorneys from a law firm) made a "limited appearance" for Guan, but counsel thereafter moved to withdraw because of apparent difficulties in their relationship with Guan.  The magistrate judge supervising the case (Moses, *J.*) denied the motion.  In July 2019, new *pro bono* counsel -- from the same clinic that had helped Guan prepare her amended complaint -- was substituted into the case for Guan, "for the limited purpose of taking and defending fact depositions," and the depositions were indeed thereafter conducted with the assistance of counsel.  Joint App'x at 387.

In November 2019, defendants moved for summary judgment. Again proceeding *pro se*, Guan opposed the motion.  On September 18, 2020, the magistrate judge issued a report and recommendation recommending that the motion be granted as to the City and denied as to the two police officers.  On

11

October 29, 2020, the district court (Daniels, *J.*) issued its memorandum decision granting the motion in full. The district court concluded that although the probable cause analysis for a mental health arrest differed from the probable cause analysis for a trespass arrest, "so long as probable cause existed for the Officer Defendants to seize and detain Plaintiff for any reason," Guan's false arrest claim would fail. Special App'x at 40. The district court further concluded that because it was undisputed that probable cause existed for the trespass arrest, the officers were entitled to summary judgment. Alternatively, the district court held that the officers were entitled to qualified immunity, concluding that a reasonable police officer could have concluded that Guan was a danger to herself or others. The district court also concluded that the City was entitled to summary judgment.[6] Judgment dismissing the amended complaint was entered on October 30, 2020.

       This appeal followed.

---

[5]     Although the amended complaint cited both §§ 1981 and 1983, the district court construed the claims as false arrest claims under § 1983 and state law. On appeal, Guan treats the claim as a "single claim," pursuant to § 1983, alleging a "false mental health arrest" in violation of the Fourth and Fourteenth Amendments. Pl.-Appellant's Brief at 11, 15.

[6]     On appeal, Guan does not challenge the dismissal of the claims against the City.

12

## DISCUSSION

We review a district court's grant of summary judgment *de novo*, construing the evidence in the light most favorable to the party opposing summary judgment and drawing all reasonable inferences in her favor. *See Dish Network Corp. v. Ace American Ins. Co.*, 21 F.4th 207, 212 (2d Cir. 2021). Summary judgment is appropriate where no genuine issue of material fact exists for trial and the moving party is entitled to judgment as a matter of law. *See id.*

### A.     Applicable Law

#### 1.     False Arrest

In analyzing § 1983 false arrest claims, we look to the law of the state in which the arrest occurred. *See Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004). In New York, to prevail on a false arrest claim, a plaintiff must show that: "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Curry v. City of Syracuse*, 316 F.3d 324, 335 (2d Cir. 2003) (internal brackets omitted).

An arrest is privileged if it is based on probable cause, for probable cause is a complete defense to a false arrest claim. *See, e.g., Figueroa v. Mazza*, 825

13

F.3d 89, 99 (2d Cir. 2016) ("The existence of probable cause to arrest . . . will defeat a claim of false arrest under the Fourth Amendment."); *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006) ("Under New York law, the existence of probable cause is an absolute defense to a false arrest claim."); *De Lourdes Torres v. Jones*, 26 N.Y.3d 742, 759 (2016) ("For purposes of the privilege element of a false arrest and imprisonment claim, an act of confinement is privileged if it stems from a lawful arrest supported by probable cause."). To determine the existence of probable cause, a court considers the totality of the circumstances, *Jenkins v. City of New York*, 478 F.3d 76, 90 (2d Cir. 2007), based on "a full sense of the evidence that led the officer to believe that there was probable cause to make an arrest." *Stansbury v. Wertman*, 721 F.3d 84, 93 (2d Cir. 2013). The court considers "those facts available to the officer at the time of the arrest and immediately before it." *Fabrikant v. French*, 691 F.3d 193, 214 (2d Cir. 2012) (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006)). "The significance of each of these factors may be enhanced or diminished by surrounding circumstances." *Jenkins*, 478 F.3d at 90.

A false arrest claim may be based on an arrest for law enforcement purposes (such as criminal trespass) or an arrest for an emergency psychiatric evaluation. *See Myers v. Patterson*, 819 F.3d 625, 632 (2d Cir. 2016). The

14

constitutional protections against an unreasonable arrest "adhere[] whether the seizure is for purposes of law enforcement or due to an individual's mental illness." *Id*. But a different probable cause analysis applies to each type of arrest.

For a law enforcement arrest, police officers have probable cause to arrest when they reasonably believe that "the person to be arrested has committed or is committing a crime." *Hernandez v. United States*, 939 F.3d 191, 199 (2d Cir. 2019) (quoting *Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 414 (2d Cir. 1999)); *see also De Lourdes Torres*, 26 N.Y.3d at 759 ("Probable cause consists of such facts and circumstances as would lead a reasonably prudent person in like circumstances to believe plaintiff guilty." (quoting *Colon v. City of New York*, 60 N.Y.2d 78, 82 (1983)). On the other hand, for a mental health arrest, police officers must have "reasonable grounds for believing that the person seized is dangerous to herself or others." *Anthony v. City of New York*, 339 F.3d 129, 137 (2d Cir. 2003) (internal quotation marks omitted); *accord Green v. City of New York*, 465 F.3d 65, 83-84 (2d Cir. 2006) (requiring a showing of

dangerousness for seizure and transportation to hospital for treatment or evaluation).[7]

In general, a plaintiff cannot recover damages on a § 1983 false arrest claim for an arrest that was supported by probable cause, even if the arresting officer lacked probable cause to arrest the plaintiff for the actual charge invoked. *Jaegly*, 439 F.3d at 154. In other words, if probable cause existed to arrest a defendant for a criminal violation, "it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." *Id*. This is so because "compensable damages in a successful false arrest claim stem from injuries associated with the detention itself, and not with the individual charges." *Id*.

The *Jaegly* decision was informed by *Devenpeck v. Alford*, where the Supreme Court held that the probable cause inquiry is based on whether the

---

7    New York Mental Hygiene Law § 9.39 provides that a hospital may admit for "immediate observation, care, and treatment" "any person alleged to have a mental illness for which immediate observation, care, and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or others." N.Y. Mental Hygiene L. § 9.39. "Likelihood to result in serious harm" means "a substantial risk of physical harm to [the individual] himself as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that he is dangerous to himself," or "a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm." *Id*.

arresting officer had objective probable cause to arrest for any offense, not whether the officer had probable cause to arrest for the specific offense invoked at the time of the arrest. 543 U.S. 146, 153 (2004). In *Devenpeck*, a false arrest case, police officers stopped Alford and pulled him over in his car because they believed he had been impersonating a police officer. They eventually arrested him for what they believed was a violation of the Washington Privacy Act -- tape recording their conversation with him during the traffic stop. *Id*. at 149. As it turned out, the officers were wrong, for Alford's taping of the conversation was not a crime. *Id*. at 151. The Supreme Court held, however, that if the officers had probable cause to arrest Alford for impersonating a police officer, his false arrest claim would be precluded, even if probable cause did not exist for a Privacy Act arrest. *Id*. at 151-53. The Court held that it was not necessary that the offense actually invoked (here, the Privacy Act violation) be "closely related" to the crime for which probable cause did exist (impersonating a police officer). *Id*. at 153.

*Devenpeck* and *Jaegly* involved arrests only for criminal violations; they did not involve a mental health arrest. *Devenpeck*, 543 U.S. at 149-50; *Jaegly*, 439 F.3d at 151.

## 2. __Qualified Immunity__

Even where actual probable cause does not exist, police officers may be entitled to qualified immunity from a § 1983 false arrest claim if their actions did not violate "clearly established" rights or if "arguable probable cause" existed at the time of the arrest. *Dancy v. McGinley*, 843 F.3d 93, 106-07 (2d Cir. 2016) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)); *Figueroa*, 825 F.3d at 100; *accord District of Columbia v. Wesby*, 138 S. Ct. 577, 591 (2018) ("Even assuming the officers lacked actual probable cause to arrest the partygoers, [the officers] are entitled to qualified immunity because . . . they reasonably but mistakenly concluded that probable cause was present." (cleaned up)). The qualified immunity defense is also available to officers making a mental health arrest. *See Myers*, 819 F.3d at 633 (considering whether officers in a false mental health arrest case had arguable probable cause and were protected by qualified immunity); *Kerman v. City of New York*, 261 F.3d 229, 238-39 (2d Cir. 2001) (same). A defendant has the burden of proving the affirmative defense of qualified immunity. *See Gomez v. Toledo*, 446 U.S. 635, 640-41 (1980).

First, police officers are immune if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person

would have known." *Dancy*, 843 F.3d at 106 (quoting *Pearson*, 555 U.S. at 231). A right is "clearly established" when "the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Jackler v. Byrne*, 658 F.3d 225, 242 (2d Cir. 2011) (cleaned up) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Moreover, if reasonable officers could disagree "on the legality of the action at issue in its particular factual context," the officer is entitled to qualified immunity. *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007).

Second, police officers are immune from a false arrest claim if "arguable probable cause" existed for the arrest. *Dancy*, 843 F.3d at 107. "A police officer has arguable probable cause if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Figueroa*, 825 F.3d at 100 (internal quotation marks omitted). The question is "not whether the officer *should have* acted as he did." *Id.* (emphasis in original). Instead, it is "whether *any* reasonable officer, out of the wide range of reasonable people who enforce the laws in this country, *could have* determined that" probable cause existed. *Id.* (emphasis in original). Indeed, as the Supreme Court

19

has repeatedly recognized, "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)); *see also Stanton v. Sims*, 571 U.S. 3, 6 (2013) (same). Whether a particular officer falls into either of these categories turns on "whether it would have been clear to a reasonable officer that the alleged conduct was unlawful in the situation he confronted." *Id.* at 1867 (internal quotation marks omitted).

B.  **Application**

As a threshold matter, the parties agree that the only element of Guan's false arrest claim in contention is whether her arrest was privileged, that is, whether the officers had probable cause to arrest her. Guan does not challenge the district court's conclusion that the officers had probable cause to arrest her for criminal trespass. The parties disagree, however, as to whether the officers had probable cause to arrest her for an emergency mental health evaluation. The district court did not decide the issue, but held that, under *Devenpeck* and *Jaegly*, the existence of probable cause to arrest Guan for trespass precluded her mental health false arrest claim, and that, in any event, the officers had arguable probable cause under the mental health arrest standard. Two

20

issues are thus presented: first, whether the existence of probable cause to arrest Guan for trespass precludes her claim for false arrest arising from an arrest for an emergency mental health evaluation; and, second, whether, assuming the mental health false arrest claim is not precluded, the officers are nevertheless protected by qualified immunity.

**1.** **Probable Cause**

We hold that the existence of probable cause to arrest an individual for a criminal violation does not preclude a false arrest claim based on a wrongful arrest for a mental health evaluation. Hence, we conclude that the district court erred in holding that probable cause for a trespass arrest obviated the need for probable cause for a mental health arrest.

First, as discussed above, different inquiries are required for the two types of arrest. Probable cause to arrest for a criminal violation such as trespass is not a sufficient basis to arrest an individual for an emergency mental health evaluation. An officer must do more than consider whether the individual in question has committed or is committing a crime. Rather, to make a mental health arrest, police officers must consider whether probable cause exists to believe the individual is a danger to herself or others, that is, whether there is a

substantial risk of serious physical harm to herself or others. *See Kerman*, 261

F.3d at 237; *Green*, 465 F.3d at 83-84; *see also O'Connor v. Donaldson*, 422 U.S. 563,

575 (1975) ("[T]here is still no constitutional basis for confining [mentally ill]

persons involuntarily if they are dangerous to no one and can live safely in

freedom.").

Second, mental health arrests are different in nature from criminal

arrests and different damages may result if a person is falsely arrested for an

emergency mental health evaluation. A mental health false arrest claim arises

from both the Fourth Amendment's protection against unreasonable mental

health seizures and the Fourteenth Amendment's due process protections.

*Myers*, 819 F.3d at 632; *Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir.

1995). In *Jaegly*, we reasoned that the compensable damages for a false arrest

claim -- referring to a criminal arrest -- "stem from injuries associated with the

detention itself, and not with the individual charges." 439 F.3d at 149. A mental

health false arrest, however, leads to injuries of a different nature than those

resulting from a law enforcement arrest. As the Supreme Court has observed in

a case involving the transfer of an individual convicted of a crime from a prison

to a mental hospital:

22

We have recognized that for the ordinary citizen, commitment to a mental hospital produces a massive curtailment of liberty, . . . and in consequence requires due process protection . . . The loss of liberty produced by an involuntary commitment is more than a loss of freedom from confinement. It is indisputable that commitment to a mental hospital can engender adverse social consequences to the individual and that [w]hether we label this phenomena 'stigma' or choose to call it something else . . . we recognize that it can occur and that it can have a very significant impact on the individual.

*Vitek v. Jones*, 445 U.S. 480, 491-92 (1980) (internal quotation marks and citations omitted); *accord Addington v. Texas*, 441 U.S. 418, 425-26 (1979).

Third, as noted above, neither *Devenpeck* nor *Jaegly* involved a mental health arrest, and they did not consider the issue of whether the existence of probable cause for a criminal arrest precludes a claim for a false mental health arrest. *See Devenpeck*, 543 U.S. at 149-50; *Jaegly*, 439 F.3d at 151. Indeed, the first paragraph of *Devenpeck* states that "[t]his case presents the question whether an arrest is lawful under the Fourth Amendment when the *criminal offense* for which there is probable cause to arrest is not 'closely related' to the offense stated by the arresting officer at the time of arrest." *Devenpeck*, 543 U.S. at 148 (emphasis added). The case was about "a series of possible criminal offenses," *id.* at 150, and the basis for a mental health arrest -- dangerousness to oneself or others -- is not a "criminal offense[]." Nor is there any language in *Jaegly* to suggest that this court

23

contemplated expanding the limited rule in *Devenpeck* to mental health cases.

And even after *Devenpeck* and *Jaegly* were decided, we still required a finding of dangerousness for a mental health arrest, as we reiterated that "[t]o handcuff and detain, even briefly, a person for mental-health reasons, an officer must have probable cause to believe that the person presented a risk of harm to herself or others." *Myers*, 819 F.3d at 632 (cleaned up).

Accordingly, we hold that the district court erred in construing *Devenpeck* and *Jaegly* to bar a mental health false arrest claim based on the mere existence of probable cause to arrest for criminal trespass. Even though probable cause existed to arrest Guan for trespass, the police officers had to have reason to believe that she was a danger to herself or others to arrest her for an emergency mental health evaluation.[8]

---

[8]    We note that when police officers confront a person who may be mentally ill and in need of assistance, there are alternatives to arresting the person. *See* Frank Sirotich, *The Criminal Justice Outcomes of Jail Diversion Programs for Persons with Mental Illness: A Review of the Evidence*, 37 J. Am. Acad. Psychiatry L. 461, 462-63 (2009) (describing, for individuals who did not meet civil commitment criteria, alternatives to mental health arrests such as police connecting mentally ill individuals with community-based mental health service providers).

The district court did not decide whether the officers had actual probable cause for a mental health arrest. Likewise, we do not reach the issue, for we conclude that the officers are protected by qualified immunity.

**2.    Qualified Immunity**

Even assuming the officers did not have actual probable cause to make a mental health arrest, they would still be protected from liability if, at the time of the arrest, it was not "clearly established" that their conduct would violate Guan's rights or if they had arguable probable cause for a mental health arrest. We conclude that the officers here are protected by qualified immunity in both respects.[9]

**a.    Clearly Established Law**

It certainly was clearly established, at the time of Guan's arrest, that an officer had probable cause to arrest an individual for a mental health evaluation only if the officer had reason to believe there was a risk of serious

---

[9]    Guan suggests on appeal that the officers waived the argument that the law was not clearly established at the time of the arrest because they did not raise the argument below. Even assuming that is true, the rule that an appellate court will not consider an issue raised for the first time on appeal is prudential, not jurisdictional, and on occasion we have exercised this discretion to address a new argument on appeal when circumstances warrant that we do so. *See Bogle-Assegai v. Connecticut*, 470 F.3d 498, 504 (2d Cir. 2006). We exercise our discretion to reach the question here.

physical harm to the individual or others.  *See, e.g.*, *Anthony*, 339 F.3d at 137; *Green*, 465 F.3d at 83-84.  It was not clearly established, however, that where police officers had probable cause to arrest a person for a criminal offense, they had to make a separate probable cause determination to arrest the person for an emergency psychiatric evaluation.

*Devenpeck* was decided in 2004 and *Jaegly* was decided in 2006.  In the context of false arrest claims arising from criminal arrests, both cases stand for the proposition that probable cause to arrest for any one charge obviated the need for probable cause to arrest for the actual charge invoked.  Guan was arrested in 2017, and no case had made clear by then that police officers could *not* arrest an individual for a mental health arrest when probable cause existed for a criminal arrest, without an additional finding of dangerousness.  Indeed, to the contrary, some district courts had held that the existence of probable cause for a criminal arrest rendered a mental health arrest privileged for purposes of a false

arrest or imprisonment claim, relying on *Jaegly*.[10]  While we decided *Myers*, which reiterated the dangerousness requirement for a mental health arrest, in 2016, after *Devenpeck* and *Jaegly*, *Myers* did not address the situation now at hand: a mental health arrest where probable cause existed for an arrest for a criminal offense.

Accordingly, we hold that Boyle and Larasaavedra are protected by qualified immunity because it was not clearly established when they arrested Guan in 2017 that they had to have probable cause to arrest her for an emergency psychiatric examination when they had probable cause to arrest her for criminal trespass.

### b.    Arguable Probable Cause

We also conclude, independent of the state of the law in 2017, that the two officers had at least arguable probable cause to take Guan into custody

---

[10]    *See, e.g.*, *Quon v. Henry*, No. 14-CV-9909, 2017 WL 1406279, at *8 (S.D.N.Y. Mar. 27, 2017) ("although Officers Grant and Henry ultimately decided to hospitalize Quon rather than place him under arrest, they had probable cause to arrest him for obstruction, which is sufficient to defeat Quon's false arrest claim," citing *Jaegly*); *Nicholas v. City of Binghamton*, No. 10-CV-1565, 2012 WL 3261409, at *6 (N.D.N.Y. Aug. 8, 2012) (holding that, even assuming probable cause did not exist for mental health arrest, existence of probable cause for disorderly conduct was sufficient to preclude false arrest claim, citing *Jaegly*).

for an emergency mental health evaluation. The undisputed facts show the following:

Guan was at Mount Sinai for some nine hours, and she gave no indication that she would leave voluntarily. By her own account, at various times during the day she felt "panicked," was "scared," felt "hopeless," and was "very cold and desperate." Joint App'x at 343-44. The officers observed that she was "irate," "shaking," "visually very upset," "incoherent," and "irrational." *Id*. at 65, 76. The officers were told by hospital personnel that she had been "yelling" and "screaming," and that she was "disruptive." *Id*. at 77. Guan repeatedly told the officers and others that the hospital had kidnapped her son and was raping him. *Id*. at 65, 86, 336. She even accused the police officers of "helping the hospital kidnap her kid." *Id*. at 65. Hospital security called 911 for police assistance twice, *id*. at 37, 339, and Guan called 911 herself at least two times. *Id*. at 186-87. A doctor told one of the officers that Guan was "emotionally disturbed, and that she needed to be seen by a psychiatrist, because of 'the way she was acting.'" *Id*. at 345. Hospital personnel told the officers that Guan was an "EDP," an emotionally disturbed person, who needed to be hospitalized. *Id*. at

28

78, 79, 345. And Adult Protective Services had removed Guan's son from the home because of concerns for his well-being.

While Guan denies that she was yelling and screaming or behaving inappropriately, it cannot reasonably be disputed that the officers were told and saw for themselves that Guan was distraught, emotionally disturbed, making wild accusations, and behaving erratically, including refusing to leave Mount Sinai after nine hours. Medical personnel -- including doctors who presumably knew the standards for an involuntary psychiatric evaluation -- were telling the officers that Guan needed to be hospitalized. Even assuming the hospital personnel exaggerated when they described her conduct to the officers, Guan does not seriously dispute what the officers were told. The officers also knew Guan's son had been removed from the home. On these facts, officers of reasonable competence could surely have disagreed as to whether probable cause existed to take Guan into custody for an emergency psychiatric evaluation. *See Figueroa*, 825 F.3d at 100. We cannot conclude, in the totality of circumstances, that *no* reasonable police officer, "out of the wide range of reasonable people who enforce the laws in this country, *could have* determined that" probable cause existed for a mental health arrest, that is, that probable

cause existed to believe that Guan presented a danger to herself or others,

including her son.  *Id.* (emphasis in original); *see also Ziglar*, 137 S. Ct. at 1867.

## <u>CONCLUSION</u>

For the reasons set forth above, the judgment of the district court

dismissing the amended complaint is AFFIRMED.  No costs.